# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| ALEX SAMUELS, BRADLEY CARICOFE, SHAWN THIBODEAUX, JULIE THIBODEAUX, CATHY CARROLL, STEPHEN JACKSON, JAMES KOHEN, and JOHN WIGGINS, individually and on behalf of all others similarly situated, | Case No. |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| FORD MOTOR COMPANY | |
| Defendant. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Alex Samuels, Bradley Caricofe, Shawn Thibodeaux, Julie Thibodeaux, Cathy Carroll, Stephen Jackson,  James Kohen, and John Wiggins (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, including a proposed Nationwide Class, Alabama Sub-Class, Florida Sub-Class, Maryland Sub-Class, Nevada Sub-Class, Tennessee Sub-Class, and Texas Sub-Class, as more fully described below, allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of their counsel:

## I.    **INTRODUCTION**

1.    This consumer class action arises out of Defendant Ford Motor Company's ("Ford" or "Defendant") design, manufacture, and sale of 2020-present Ford Explorer 2.3L or 3.0L ST vehicles ("Class Vehicle(s)" or "Defective Class Vehicle(s)").  The defective Class Vehicles are uniformly and dangerously defective in that they are equipped with a rear subframe assembly which attaches the rear axle with a single horizontal mounting bolt ("Rear Subframe Assembly") which does or can cause or otherwise result in a sudden, even violent, disconnection of the rear drive shaft assembly or its component parts, especially including while the vehicle is in motion (the "Mounting Bolt Defect" or "Defect"). The Defect results in the total loss of driver control—steering, breaking and speed control—of the Class Vehicle while in operation. Loss of control drastically increases the risk of collision, which

threatens injuring passengers, bystanders, property, and other vehicles' drivers and passengers.

2.     Defendant Ford designed, manufactured, marketed, distributed, sold, and/or caused to be sold or leased the Class Vehicles to consumers, including Plaintiffs, without disclosing the uniform and dangerous Defect, which it has yet to remedy.

3.     Defendant Ford's actions have violated its obligation and duty to provide consumers with vehicles that are safe and to alert them to, or otherwise warn them of, vehicle defects that implicate serious safety issues, and to both (1) accept the responsibility to adequately fix or replace the Defective Class Vehicles and (2) absorb the cost to do so, rather than imposing those costs on their owners or lessees.

4.     The principal purpose of a rear subframe in a vehicle is to spread high chassis loads over a wide area of relatively thin sheet metal of a monocoque body shell, and to isolate vibrations and harshness from the rest of the body.   The subframe, which is below the vehicle's frame, supports its axle, suspension, and power frame, thus providing stability and ride quality necessary to vehicle dynamics and safety.

5.     The Rear Subframe Assembly installed on each Class Vehicle is defective.  It provides insufficient structural support for the connection between the rear subframe and the rear differential and drive shaft and does not provide adequate

support or strength sufficient to withstand the high horsepower and torque rating of the Class Vehicles because it is designed, manufactured, and installed in such a manner that it can or does cause the single rear bolt to fracture or fail, which then causes the vehicle's rear differential to drop.  When the bolt shatters, the rear drive shaft and rear differential can disconnect from the subframe, and the vehicle will lose power to the rear wheels. Even before the bolt fails completely, it will show signs of stress and may deform, as will the bushings near the bolt.

6.    A failure of the single rear axle horizontal mounting bolt with respect to the Rear Subframe Assembly is especially dangerous when the vehicle is in operation. When the bolt fails while a Class Vehicle is being driven, the rear differential and rear axle half-shafts can detach, damaging the vehicle's suspension, driveshaft, and/or exhaust system. As a result, the vehicle can lose power while in motion and the drivability of the vehicle can be severely impacted. This increases the risk of collision due to the driver's inability to maintain steering and speed control.

7.    The Mounting Bolt Defect presents a significant safety hazard. The Mounting Bolt Defect endangers drivers, pedestrians, and other vehicles because it makes accidents more likely, and sometimes entirely unavoidable. For this reason, Class Members have consistently reported fear of driving their Class Vehicles.

8.    This Mounting Bolt Defect is inherent in each Defective Class Vehicle

4

and was present at the time of sale or lease of each Class Vehicle. But Ford ignored the Defect and its known consequences inherent in the Class Vehicles. By 2019 – if not earlier – Defendant was aware that the Explorer ST vehicles, with their higher horsepower and torque rated characteristic, required a four-bolt rear subframe assembly (with two rear axle molting bolts), as more fully demonstrated by the pre-sale design and testing of the redesigned 2020 Ford ST. Ford even tested and designed its specifications for such vehicles requiring a four-bolt rear subframe assembly (with two rear axle mounting bolts) on the higher horsepower and torque rated Ford Explorer vehicles.

9.     However, Ford only implemented the four-bolt subframe in a small subset of the 2020 Ford Explorer STs with higher horsepower and torque ratings. Instead of using the four-bolt assembly design, Ford used the unsafe Rear Subframe Assembly with one rear axle mounting bolt. Discovery will show Ford used the defective Rear Subframe Assembly due to supply chain issues beginning in 2020 with the Covid pandemic and to save costs.

10.     Ford has been aware that the Class Vehicles' Rear Subframe Assembly is defective and that due to the Defect, the Class Vehicles would require frequent repair, could prematurely fail, would require replacement—including replacements outside of Ford's three year/36,000 mile New Vehicle Limited Warranty—and that its intended replacements were as defective as the original Rear Subframe Assembly.

Nonetheless, Ford equipped and continued to equip the Class Vehicles with the defective Rear Subframe Assembly.

11.    Ford is also aware that many owners and lessees of the Defective Class Vehicles have complained that their Rear Subframe Assembly requires or has required repair or replacement. Still, consumers have been refused an adequate repair, even while within the warranty period. Ford has also been aware that complaints have been made by Class Members to the National Highway Traffic Safety Administration ("NHTSA"). Nonetheless, Ford has failed to adequately remedy the Defect.

12.    Ford knowingly concealed and affirmatively took measures to conceal the Mounting Bolt Defect and its failures and related malfunctions, even though Ford had secured and/or has possessed superior or exclusive knowledge of material facts regarding the Mounting Bolt Defect due to, *inter alia*, its pre-production testing, failure mode analysis, and complaints associated with the Defect both to dealers and NHTSA, dealer audits, aggregate warranty information, complaints by consumers on websites and internet forums, aggregate part sales, aggregate warranty information, dealership repair orders, Technical Service Bulletin ("TSB"), and other internal sources of information available to Ford. Class Members have been told that their "vehicles are operating normally" or "operating as intended" —even though they are not—while Ford continues to deny the existence of the Defect. Ford

continued to conceal and obfuscate the true nature, extent, and depth of the Defect, instead, electing to deceptively claim that "in some of the affected vehicles, the rear axle mounting bolt may fracture during vehicle acceleration," adding that "a fractured rear axle bolt will allow the rear axle housing to move out of position, resulting in severe noise and vibration." But it is the design and manufacture of the Rear Subframe Assembly as a whole that is defective, rather than simply the bolt.

13.    Ford had exclusive knowledge of the Defect before the Class Vehicles went to market, which continued while the Class Vehicles were being driven by unwitting consumers. Ford did not inform consumers (or dealerships) of the true nature, extent, and depth of the Defect, but could have done so through advertising, communication of information to dealerships to relay to consumers, written disclosures, etc. Instead, as detailed herein, Ford manufactured vehicles with the Defect and fraudulently omitted this information from consumers at the point of sale.

14.    Rather than repair the Defect under warranty, Ford has also hidden the Defect by instructing dealers to perform a "software update" and/or replacing the Rear Subframe Assembly only if and when the subframe bolt fails—and just once. This is not a remediation. It is a cover-up of the dangerous Defect and safety hazard.

15.    It is incumbent on Ford to immediately replace the defectively designed and manufactured Rear Subframe Assembly with the four-bolt rear subframe assembly (with two rear axle mounting bolts) that it has already designed, tested,

approved, and specified for higher horsepower and torque-rated vehicles.

16.    Because of Ford's fraudulent concealment of the Defect in violation of state consumer protection acts and the common law of fraudulent concealment, its breaches of express warranties and implied warranties of merchantability, and its failure to act in disclosing and providing a remedy for the Defect, owners and lessees of Defective Class Vehicles are injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Defendant disclosed the Mounting Bolt Defect, Plaintiffs and class members would not have purchased or leased their Class Vehicles or would have paid substantially less for them.

## II.    **<u>JURISDICTION AND VENUE</u>**

17.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one member of the class of plaintiffs and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18.    This Court has specific personal jurisdiction over Defendant Ford because it is headquartered in Dearborn, Michigan. Defendant has purposefully availed itself of the benefits and protections of the State of Michigan by continuously

and systematically conducting substantial business in and from this judicial district, directing advertising and marketing materials to districts within Michigan, and intentionally and purposefully placing the Defective Class Vehicles into the stream of commerce within Michigan, and throughout the United States, with the expectation and intent that consumers throughout the United States would purchase them. Many thousands of Defective Class Vehicles have been sold in Michigan and across America, and are operated within this State and the judicial district.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Ford transacts business in this judicial district, is subject to personal jurisdiction in this judicial district, and therefore is a citizen of this judicial district. Additionally, Ford has advertised in this judicial district and Ford has received substantial revenue and profits from its sales and/or leasing of Defective Class Vehicles in this judicial district; therefore, a substantial and material part of the events and/or omissions giving rise to the claims occurred within this judicial district.

## III.    PARTIES

### Plaintiff Alex Samuels

20.    Plaintiff Alex Samuels is an Alabama citizen domiciled in Opelika, Alabama.

21.    In or around November 2020, Plaintiff Samuels purchased a new 2020

9

Ford Explorer from Opelika Ford Chrysler Dodge Jeep Ram ("Opelika Ford"), authorized Ford dealership located in Opelika, Alabama.

22.    Plaintiff Samuels purchased his vehicle primarily for personal, family, or household use.

23.    Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff Samuels' decision to purchase his vehicle. Before making his purchase, Plaintiff Samuel researched the 2020 Ford Explorer online, by "Googling" the vehicle. At the dealership, Plaintiff Samuels also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle, test drove the vehicle, and spoke with dealership personnel about the vehicle. At no point did Ford disclose the Mounting Bolt Defect to Plaintiff.

24.    Ford's omissions were material to Plaintiff Samuels. Had Ford disclosed its knowledge of the Defect before he purchased his vehicle, Plaintiff Samuels would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Samuels would not have purchased his vehicle or would have paid less for it.

25.    In 2022, Plaintiff Samuels learned that his vehicle was built with a rear subframe that it is prone to failure when he received written correspondence from Ford advising him about a recall. Plaintiff Samuels brought his vehicle to Opelika Ford. The dealership performed the recall, which consisted only of a software update

10

to engage the parking brake and prevent rollaway. As this repair did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiff Samuels remained at risk due the Defect and ignorant of the true cause of the Defect, i.e., the defective single-bolt design.

26.    In the Spring of 2023, the horizontal rear axle bolt broke while Plaintiff Samuels was driving his vehicle. His steering wheel suddenly turned to the side and the car fell directly on top of the rear wheels. At the time, the vehicle had approximately 42,000 miles on the odometer. Plaintiffs Samuels had the vehicle delivered to Opelika Ford for repair. Opelika Ford confirmed that the collapse was due to a shattered rear bolt and replaced the rear axle and rear subframe without charge. Plaintiff Samuels had to pay approximately $330 for an alignment and new rear tires.

27.    Despite presenting his vehicle to a Ford dealership, Plaintiff Samuels has not received a permanent repair under warranty or under the recall, and his vehicle continues to exhibit the Defect because the rear subframe only has a single horizontal rear axle mounting bolt.

28.    As a result of the Mounting Bolt Defect, Plaintiff Samuels has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Samuels will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so

will not purchase or lease another Class Vehicle, although he would like to do so.

29.     At all times, Plaintiff Samuels, like all Class Members, has driven his vehicle in a foreseeable and intended manner.

**Plaintiff James Kohen**

30.     Plaintiff James Kohen is an Alabama citizen residing in Silas, Alabama.

31.     Plaintiff Kohen purchased a new 2022 Ford Explorer ST from Mullinax Ford in Mobile, Alabama. Plaintiff Kohen's vehicle has only one rear subframe mounting bolt.

32.     Plaintiff Kohen purchased his vehicle primarily for personal, family, or household use.

33.     Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff Kohen's decision to purchase his vehicle. Before making his purchase, Plaintiff Kohen researched the 2022 Ford Explorer ST online. Plaintiff also relied on Ford's website, which he used to custom design his vehicle.

34.     Plaintiff Kohen also visited the Mullinax Ford in person, where he discussed the features of the 2022 Ford Explorer with dealership personnel. At no point did Ford disclose the Mounting Bolt Defect to Plaintiff.  Plaintiff Kohen also test-drove a comparable Ford Explorer. Based on the information provided to him by Ford, Plaintiff Kohen believed that the 2022 Ford Explorer ST would be a safe and reliable vehicle.

35.    Ford's omissions were material to Plaintiff Kohen. Had Ford disclosed its knowledge of the Mounting Bolt Defect before he purchased his vehicle, Plaintiff Kohen would have seen and been aware of the disclosures. Furthermore, had he known of the Mounting Bolt Defect, Plaintiff Kohen would not have purchased his vehicle or would have paid less for it.

36.    In 2022, Plaintiff Kohen learned that his vehicle was built with a rear subframe that it is prone to failure when he received written correspondence from Ford advising him about a recall. As this repair did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiff Kohen remained at risk due the Defect and ignorant of the true cause of the Defect, i.e., the defective single-bolt design.

37.    Thereafter, Plaintiff Kohen brought his vehicle to Mullinax Ford in Mobile, Alabama, for repair pursuant to the recall. However, the recall repair consisted only of a software update to engage the parking brake and prevent rollaway. Plaintiff Kohen discussed the insufficiency of this repair with a service representative at Mullinax Ford, but was told that Ford would not authorize the replacement of the defective subframe with a non-defective, two-bolt subframe. As the software repair did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiff Kohen continues to fear for his safety. Plaintiff Kohen's defective rear subframe continues to present a safety risk.

38.    As a result of the Mounting Bolt Defect, Plaintiff Kohen has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Kohen will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

39.    At all times, Plaintiff Kohen, like all Class Members, has driven his vehicle in a foreseeable and intended manner.

**Plaintiff Bradley Caricofe**

40.    Plaintiff Bradley Caricofe is a Virginia citizen residing in Woodbridge, Virginia.

41.    In or around August 2021, Plaintiff Caricofe purchased a new 2021 Ford Explorer ST from Waldorf Ford, an authorized Ford dealership located in Waldorf, Maryland.

42.    Plaintiff Caricofe purchased his vehicle primarily for personal, family, or household use.

43.    Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff Caricofe's decision to purchase his vehicle. Before making his purchase, Plaintiff Caricofe researched the 2021 Ford Explorer ST online, by "Googling" the vehicle and looking up crash test reports. Additionally, Plaintiff Caricofe did significant research in 2019, when purchasing the then newly

designed Ford Explorer, the 2020 Ford Explorer ST.

44.     At the dealership, Plaintiff Caricofe reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Caricofe also discussed the safety features of the vehicle with dealership personnel. At no point did Ford disclose the Mounting Bolt Defect to Plaintiff. Plaintiff Caricofe believed that the 2021 Ford Explorer ST would be a safe and reliable vehicle.

45.     Ford's omissions were material to Plaintiff Caricofe. Had Ford disclosed its knowledge of the Mounting Bolt Defect before he purchased his vehicle, Plaintiff Caricofe would have seen and been aware of the disclosures. Furthermore, had he known of the Mounting Bolt Defect, Plaintiff Caricofe would not have purchased his vehicle or would have paid less for it.

46.     In 2022, Plaintiff Caricofe learned that his vehicle was built with a rear subframe that it is prone to failure when he received written correspondence from Ford advising him about a recall. The recall did not reveal the true cause of the Defect: the single-bolt design. Therefore, Plaintiff Caricofe remained ignorant of the cause of the Defect.

47.     In early 2023, Plaintiff Caricofe brought his vehicle to Koons Woodbridge Ford, an authorized Ford dealer located in Woodbridge, Virginia, for repair pursuant to the recall. However, the recall repair consisted only of a software

update to engage the parking brake and prevent rollaway. As this repair did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiff Caricofe continues to fear for his safety. He has requested replacement of the rear subframe with a frame that is not defective from the Ford-authorized dealer multiple times but has been continually refused. Indeed, the dealership has informed Plaintiff Caricofe that Ford has no fix for this issue. Plaintiff Caricofe's defective rear subframe continues to present a safety risk.

48.    Despite presenting his vehicle to a Ford dealership, Plaintiff Caricofe has not received a permanent repair under warranty, and his vehicle continues to exhibit the Mounting Bolt Defect.

49.    As a result of the Mounting Bolt Defect, Plaintiff Caricofe has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Caricofe will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

50.    At all times, Plaintiff Caricofe, like all Class Members, has driven his vehicle in a foreseeable and intended manner.

**Plaintiffs Shawn and Julie Thibodeaux**

51.    Plaintiffs Shawn and Julie Thibodeaux ("Thibodeaux") are Texas citizens residing in Katy, Texas.

16

52.   In or around February 2022, Plaintiffs Thibodeaux purchased a new 2022 Ford Explorer ST from Mac Haik Ford, an authorized Ford dealership located in Houston, Texas.

53.   Plaintiffs Thibodeaux purchase their vehicle for personal, family, or household use.

54.   The safety, reliability, and quality of the vehicle and its components were important factors in Plaintiffs Thibodeaux's decision to purchase their vehicle. Before making their purchase, Plaintiffs Thibodeaux test drove a Ford Explorer ST and reviewed the Mac Haik Ford dealership website. At the dealership, Plaintiffs Thibodeaux also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. At no point did Ford disclose the Mounting Bolt Defect to Plaintiff. Plaintiff Thibodeaux believed that the 2022 Ford Explorer ST would be a safe and reliable vehicle.

55.   Ford's omissions were material to Plaintiffs Thibodeaux. Had Ford disclosed its knowledge of the Mounting Bolt Defect before they purchased their vehicle, Plaintiffs Thibodeaux would have seen and been aware of the disclosures. Furthermore, had they known of the Mounting Bolt Defect, Plaintiffs Thibodeaux would not have purchased their vehicle or would have paid less for it.

56.   In late 2022, Plaintiffs Thibodeaux learned that their vehicle was built with a rear subframe that is prone to failure when via written correspondence from

Ford that there was a recall issued for this problem. Immediately thereafter, on or around September 30, 2022, Plaintiffs brought their vehicle to Ryan Ford, an authorized Ford dealer located in Sealy, Texas, for repair pursuant to the recall. However, the recall repair consisted only of a software update to engage the parking brake and prevent rollaway. As this repair did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiffs Thibodeaux remained at risk due the Defect and ignorant of the true cause of the Defect, i.e., the defective single-bolt design.

57. Despite presenting their vehicle to a Ford dealership, Plaintiffs Thibodeaux have not received a permanent repair under warranty, and their vehicle continues to exhibit the Mounting Bolt Defect.

58. As a result of the Mounting Bolt Defect, Plaintiffs Thibodeaux have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiffs Thibodeaux will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although they would like to do so.

59. At all times, Plaintiffs Thibodeaux, like all Class Members, have driven their vehicle in a foreseeable and intended manner.

**Plaintiff Cathy Carroll**

60.     Plaintiff Carroll is a Colorado citizen domiciled in Thornton, Colorado.

61.     On or around April 1, 2022, Plaintiff Carroll purchased a new 2022 Ford Explorer ST from Friendship Ford, an authorized Ford dealership located in Bristol, Tennessee.

62.     Plaintiff Carroll purchased her vehicle primarily for personal, family, or household use.

63.     Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff Carroll's decision to purchase her vehicle. Before making her purchase, Plaintiff Carroll researched the 2022 Ford Explorer ST online, visiting both the manufacturer's and the dealership's websites and specifically researched prices and options on the vehicle. She also reviewed crash test reports and advertisements by Ford touting the JD Power & Associates ratings. She also saw many commercials disseminated by Ford about the reliability of Ford vehicles. At the dealership, Plaintiff Carroll also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle, test drove the vehicle, and spoke with dealership personnel about the vehicle. Dealership personnel mentioned that Ford would be issuing a "retrofit" on the vehicle in the future due a "rear bolt issue," but assured that the issue was "not a big deal." At no point did Ford disclose the Mounting Bolt Defect to Plaintiff.

19

64.    Ford's omissions were material to Plaintiff Carroll. Had Ford disclosed its knowledge of the Mounting Bolt Defect before she purchased her vehicle, Plaintiff Carroll would have seen and been aware of the disclosures. Furthermore, had she known of the associated safety risk of the Mounting Bolt Defect, Plaintiff Carroll would not have purchased her vehicle or would have paid less for it.

65.    Shortly after her purchase, Plaintiff Carroll received written correspondence from Ford about the 2022 Recall. At that time, Plaintiff Carroll learned that her vehicle was built with a rear subframe that is prone to failure.  As this recall did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiff Carroll remained at risk due the Defect and ignorant of the true cause of the Defect, i.e., the defective single-bolt design.

66.    As a result of the Mounting Bolt Defect, Plaintiff Carroll has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Carroll will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

67.    At all times, Plaintiff Carroll, like all Class Members, has driven her vehicle in a foreseeable and intended manner

**Plaintiff Stephen Jackson**

68.    Plaintiff Stephen Jackson is and was at all relevant times a California

citizen residing in Tahoe, California.

69.    On or around March 7, 2020, Plaintiff Jackson purchased a new 2020 Ford Explorer from Jones West Ford, an authorized Ford dealership located at 3600 Kietzke Lane in Reno, Nevada 89502. Plaintiff Jackson was a California citizen at the time of purchase. The paperwork Plaintiff Jackson received from Jones West Ford for this purchase included a "California Resident Checklist" pursuant to which Jones West Ford stated that it would hold all paperwork until Plaintiff Jackson paid for his registration fees with the California DMV.

70.    Plaintiff Jackson purchased his vehicle primarily for personal, family, or household use.

71.    Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff Jackson researched the 2020 Ford Explorer online, by reviewing Ford's website, on which he "built" an Explorer to see various options, and the dealership's website. At the dealership, Plaintiff also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle as well as various safety features. At no point did Ford disclose the Mounting Bolt Defect to Plaintiff. Accordingly, Plaintiff Jackson believed that the 2020 Ford Explorer would be a safe and reliable vehicle.

72.    Ford's omissions were material to Plaintiff Jackson. Had Ford disclosed

21

its knowledge of the Mounting Bolt Defect before he purchased his vehicle, Plaintiff Jackson would have seen and been aware of the disclosures. Furthermore, had he known of the Mounting Bolt Defect, Plaintiff would not have purchased his vehicle or would have paid less for it, or would have insisted Ford repair the defect.

73.    Plaintiff Jackson never received a recall notice related to the Mounting Bolt Defect, and Ford has not taken any action to repair the defect in Plaintiff Jackson's vehicle. On or around June 1, 2021, Plaintiff Jackson brought his vehicle to Corwin Ford Reno, an authorized Ford dealer located in Reno, Nevada, for repairs pursuant to two unrelated recall notices from Ford. None of the repairs did anything to address the safety risk of the rear subframe failing while the Class Vehicle is in motion. Plaintiff Jackson continues to fear for his safety and his defective rear subframe continues to present a safety risk.

74.    Plaintiff Jackson has not received a permanent repair under warranty, and his vehicle continues to exhibit the Mounting Bolt Defect.

75.    As a result of the Mounting Bolt Defect, Plaintiff Jackson has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Jackson will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Ford vehicle, although they would like to do so.

76.    At all times, Plaintiff Jackson has driven and maintained his vehicle

foreseeably, in a manner consistent with Ford's instructions, and consistent with his vehicle's intended use.

**Plaintiff John Wiggins**

77.    Plaintiff John Wiggins is a resident and citizen of Aurora, Colorado, who purchased a Class Vehicle in April 2022 with approximately 600 miles on it from Gary Yeomans Ford in Daytona Beach, Florida.

78.    Plaintiff Wiggins' Ford Explorer ST 2.3 liter is a Defective Class Vehicle equipped with the Mounting Bolt Defect.

79.    Neither Mr. Wiggins, the registered owner of the vehicle, nor his wife, Antoinette Jordan, who assisted in the purchase of the vehicle, were informed of any defect of design and/or manufacture relating to the Vehicle.

80.    Instead, Plaintiff Wiggins was exposed to Ford's uniform and pervasive marketing messages of reliability, dependability, and safety. Plaintiff Wiggins is now concerned about his vehicle due to the Defect.

81.    Plaintiff Wiggins would not have purchased his vehicle, or would have paid less for it, had he known about the Defect prior to purchase.

82.    As a result of the Mounting Bolt Defect, Plaintiffs Wiggins has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

83.    Plaintiff Wiggins has received notice of "Customer Satisfaction

Program 24N01," which provides for replacement of the existing mounting bolt. However, the repair consists only of replacement of the existing bolt and does not remedy the true cause of the Defect, *i.e.*, the defective single-bolt design.

84.    At all times, Plaintiff Wiggins, like all Class Members, has driven his vehicle in a foreseeable and intended manner.

**Defendant Ford Motor Company**

85.    Defendant Ford Motor Company ("Ford") is a corporation organized and existing under the laws of the State of Delaware, and headquartered in Dearborn, Michigan.

86.    At all times relevant herein, Defendant was engaging in the business of designing, manufacturing, construction, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in the United States.

87.    Ford offers passenger cars, utility vehicles, minivans, trucks, and commercial vans, and distributes automotive service parts and accessories. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, within and throughout the United States.

88.    From its headquarters in Michigan, Defendant Ford marketed the Class Vehicles to consumers.

89.    Ford and/or its agents designed and manufactured the Defective Class

Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Defective Class Vehicles, with the intent that such documents be distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## IV.   **FACTUAL ALLEGATIONS**

90.    Ford designed, manufactured, distributed, warranted, and marketed the Class Vehicles. According to publicly available information, consumers purchased more than 400,000 Class Vehicles.

91.    "The subframe is a critical element between the road loads and the passenger compartment. It acts as a mount structure for the suspension and it reacts to vehicle travel on corners, on bumps, and acceleration and braking." The subframe is the structure below the frame to which the suspension, axles and drivetrain components are mounted. The purpose of the subframe is to spread the load of the frame over a wider area and dampen the vibrations of the powertrain such that they do not reach the passenger compartment. In order to accomplish these tasks, the subframe is subject to torsional (or twisting) loads, and as such, needs to be made of sufficient materials and mounted in such a way that those loads do not overwhelm, i.e. fracture or warp, those materials.

92.    The subframe is an essential component to vehicle stability and

dynamics and ultimately, the overall safety of vehicle, especially while in motion. The rear subframe is particularly critical for vehicles that are designed to send high torsional loads to the rear axle, including rear-wheel drive vehicles.

93.    Symptoms of the deterioration of a rear subframe or its related components, such as bushings, due to high torsion include: wheel misalignments, which compromise the vehicle's responsiveness to steering; premature wear on suspension and drivetrain components; pulling to the side while braking; clunking or rattling noises, especially when going over bumps; loosening of the rear differential such that it may detach and damage the suspension or drivetrain components; and catastrophic failure, in which the rear subframe itself and attached components like the rear axle detach from the vehicle while in motion.

94.    The defective single-bolt subframe is pictured below.

Fig. 1 – Rear Subframe with One Rear Axle Mounting Bolt



Fig. 2 – Close Up of One Rear Axle Mounting Bolt in Fig. 1, as Attached to Vehicle



95.     Discovery will show that all Class Vehicles' rear subframes are designed, manufactured, and installed by Ford in substantially the same manner.

96.     Discovery will confirm that the Mounting Bolt Defect in all Class Vehicles is caused by improperly designed, manufactured, and/or installed rear subframes in the Class Vehicles, which are equipped with only one rear axle mounting bolt.

97.     The Mounting Bolt Defect is inherent in, and the same for, all Class Vehicles.

98.     Discovery will show that Ford was aware of material facts regarding the Mounting Bolt Defect, in particular as a result of pre-production testing, manufacturing quality control audits, and early post-sale complaints by consumers who purchased the Class Vehicles and experienced the Mounting Bolt Defect.

Despite this knowledge, Ford failed to disclose the Mounting Bolt Defect and its associated safety risk to consumers. As a result of this failure, Plaintiffs and Class Members have been damaged.

99.    A subset of 2020-2022 Ford Explorer ST vehicles are designed and manufactured properly, because Ford used two rear axle horizontal mounting bolts, as pictured below:

Fig. 3 – Rear Subframe with Two Rear Axle Mounting Bolts



Fig. 4 – Close Up of Two Rear Axle Mounting Bolts in Fig. 2, Attached to Vehicle



100.   Ford marketed the Class Vehicles as not only being capable of providing safe and reliable transportation, in broadcast commercials on television and on the internet, but also as "Built for Life's Adventures . . . empowering adventure-seekers and active families to pack up their gear, load up the gang, and head out."

101.   In particular, Ford touted that the all-new 2020 Explorer came with a functional rear-wheel drive or all-wheel drive, which would provide "Dynamic on- and off-road capability" and "exceptional towing capacity."

102.   Ford also described the 2.3L EcoBoost engine as having an "overboost function that lifts output on every gear change," with more horsepower and towing capacity (up to 3,000 pounds) than previous iterations.   The 3.0L engine was described as having best-in-class torque for the enhanced engine and being able to "merg[e] onto the highway. Or pass[] on a two-lane.  You have the capability you need, whenever you need it."  Ford described Vehicles with this engine as "tuned by engineers at Ford Performance" with 415-lb-ft of torque and sport-tuned suspension for an "even more engaging driving experience." However, at no time did Ford reveal the performance of these engines would be undermined by the use of an inferior subframe attached with a single bolt.

103.   For the 2021 Ford Explorer, Ford advertised that the vehicle was a 2020 IIHS Top Safety Pick Plus winner that "help[s] get you where you want to go,"

without revealing the Defect or its associated safety risk.  Again, vehicles with the 3.0L engine were promoted as having "best-in-class V6 horsepower and torque [that] gives you the commanding performance you're looking for."  Vehicles with the 2.3L engine were promised more horsepower and more towing capacity.  At no time did Ford mention that the increased power and torque could and would displace, warp, or break the mounting bolt on the rear subframe, distort or destroy the bushings on the subframe (which mitigate vibration), damage the rear axle of the vehicle, disconnect the rear differential, and/or damage drive train components.

### The Mounting Bolt Defect Poses an Unreasonable Safety Hazard

104.  The Mounting Bolt Defect can impair the drivability of the Class Vehicle which in turn increases the likelihood of collision.

105.  The existence of the Mounting Bolt Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. *See* Ex. 1 (complaints to NHTSA from consumers regarding the Mounting Bolt Defect). Had Plaintiffs and other Class Members known of the Mounting Bolt Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them at all.

106.  Reasonable consumers, like Plaintiffs, expect that a vehicle's rear subframe is safe, functional, and free from defects. Plaintiffs and Class Members further reasonably expect that Ford will not sell or lease vehicles with known safety

defects, such as the Mounting Bolt Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Ford to conceal and fail to disclose the Mounting Bolt Defect and to then continually deny its existence.

**Ford Had Superior and Exclusive Knowledge of the Mounting Bolt Defect**

107.   Ford had superior and exclusive knowledge of the Mounting Bolt Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

108.   Discovery will show that before Plaintiffs purchased their Class Vehicles, and since at least 2019, Ford knew the Class Vehicles required two rear axle mounting bolts. Since at least the beginning of 2020 (and likely since 2018 or 2019), Ford knew about the Mounting Bolt Defect through sources not available to consumers, including pre-release testing data, early consumer complaints, high failure rates and replacement part sales data, consumer complaints to NHTSA (which Ford monitors) (*see* Ex. 1), and through other aggregate data from Ford's dealers about the problem. The TSBs, which are not disseminated to consumers, developed by Ford to address the Mounting Bolt Defect also demonstrate Ford's knowledge.

109.   While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive

and exclusive knowledge about what was needed for the rear subframe on the re-designed 2020 Ford Explorer to withstand the output of the vehicles' engines. Adequate and industry-standard pre-release analysis of the design, engineering, and manufacture of these vehicles for durability would have revealed to Ford that the design and/or manufacture of the vehicles with a single horizontal bolt was insufficient to keep the vehicle intact.

110.   Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, on incoming components, including the rear subframe and the bolts by which the rear subframe is attached, to verify the parts are free from defect and align with Ford's specifications.[1] Thus, Ford knew or should have known the rear subframe was defective and posed a serious safety risk to consumers.

111.   Ford touts its extensive pre-production testing, both in the United States at its Michigan and Arizona Proving Grounds, and at testing centers throughout the world, including in the United Arab Emirates, Thailand, China, Australia, and India. Indeed, pre-production durability testing of the vehicles with Ford's Total Durability Cycle necessarily would have revealed the Defect and its associated safety risk.

---

[1] Ex. 2, Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited Oct. 9, 2023).

Despite this, Ford manufactured hundreds of thousands of vehicles with the defective rear subframe, including the Class Vehicles.

112.    The specifications for the 2020 Ford Explorer ST, which date back to 2019, required two rear axle mounting bolts, *exactly the design and manufacture Ford should have used in the Class Vehicles*. The specifications shows that Ford understood how to safely design the Ford Explorer and instead knowingly chose an inferior design.

113.    Additionally, discovery will show that Ford knew of the impact of the Defect from the sheer number of reports it received from consumers. Ford's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Defect, which led to the release of TSBs and other dealer communications. Ford's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

114.    Ford's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Ford's policy that when a repair is made under warranty, the dealership must provide Ford with detailed documentation of the problem and a complete disclosure of the repairs

employed to correct it. Dealerships have an incentive to provide detailed information to Ford because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently documented. Ford has exclusive access to the aggregate warranty data submitted by its dealerships, which shows trends of defects in its vehicles nationwide.

## Ford Issued Several Inadequate Recalls for the Class Vehicles, Further Concealing the Defect from Consumers

115.  Ford first issued Special Service Message ("SSM") 50471 in February 2022 for Model Year ("MY") 2020–2022 Ford Explorer vehicles, advising that "[s]ome 2020-2022 Explorer vehicles may exhibit a rear axle mounting bolt that has broken." Ford explained that, "[i]n order to correct the condition, the rear subframe, differential cover, and mounting bolts will need to be replaced in addition to any other damaged components."

116.  On April 14, 2022, Ford issued a Safety Recall Report (Manufacturer Recall No. 22S27) recalling 2020–2022 Ford Explorer 2.3L RWD / 3.0L PHEV / 3.3 L FHEV Retail / 3.0L ST gas vehicles.[2] The Safety Recall Report ("Recall" or "2022 Recall") explained that the affected vehicles are "equipped with suspect rear axle bolts and and [sic] an older version of Electronic Park Brake Software."

---

[2] Recall No. 22S27 also included two types of Ford Explorer police vehicles that are not sold to the general public and are not a part of this Complaint.

117.    The Recall described the Defect as follows:

>   Affected vehicles were built with a 3-point mounted axle design. On some units the rear axle horizontal mounting bolt may fracture. Powertrain torque through the driveline causes axle rotation of the pinion angled towards the subframe, which exerts a bending force on the rear axle bolt. Peak torque is normally experienced during a launch event. After numerous peak torque events are experienced, the bolt may suffer a fatigue failure, which will lead to the axle housing moving out of position, resulting in a condition described by customers and dealer technicians variably as loud, grinding, binding, or clunking noises.

118.    The Recall describes the safety risk of the Defect as follows:

>   If the rear axle bolt breaks, the driveshaft/half shafts may become disconnected, resulting in loss of transmission torque to the rear wheels which is necessary to hold the vehicle in park. If the parking brake is not applied, the loss of the primary park torque will allow the vehicle to roll in park increasing the risk of crash and injury.

119.    The above-described issues occur without warning according to the Safety Report ("Identification of Any Warning that can Occur: NA").  The Remedy Program initiated as part of the recall merely instructs affected vehicle owners to take their vehicle to a Ford or Lincoln dealer to have the PCM software updated to engage the Electronic Park Brake when Park is commanded."

120.    Ford observed in the recall notice "[o]n some units the rear axle horizontal mounting bolt may fracture. Powertrain torque through the driveline

causes axle rotation of the pinion angled towards the subframe, which exerts a bending force on the rear axle bolt . . . The joint design is not robust to peak axle input torques and manufacturing variability. The primary contributor is insufficient bearing area for maximum joint loads. This results in bearing area deformation, increasing bending stress on the bolt, which may lead to a fatigue failure."

121.   Ford only partially explained the risk of the Mounting Bolt Defect: "If the rear axle bolt breaks, the driveshaft/half shafts may become disconnected, resulting in loss of transmission torque to the rear wheels which is necessary to hold the vehicle in park. If the parking brake is not applied, the loss of the primary park torque will allow the vehicle to roll in park increasing the risk of crash and injury."

122.   Ford ignored the other obvious possibility: that the driveshaft/half shafts may become disconnected while the car is moving.

123.   The Recall also included a Chronology of Defect/Noncompliance Determination (the "Chronology"). Per the Chronology, Ford was undeniably aware of the Mounting Bolt Defect as early as August 2021 when it reviewed warranty claims.

124.   On April 19, 2022, Ford issued a Delivery Hold to all U.S. Ford and Lincoln Dealers pursuant to the Recall that stated, "[i]n some of the affected vehicles, the rear axle mounting bolt may fracture during vehicle acceleration. A fractured rear axle bolt will allow the rear axle housing to move out of position,

resulting in severe noise and vibration."

125.    In June 2022, Ford began Customer Satisfaction Program 22N06, which provided a "one-time repair (if needed) to the parts required to replace a rear subframe bushing and axle cover due to a rear axle bolt bending and fracturing for ten (10) years of service or 150,000 miles from the warranty start date of the vehicle, whichever occurs first."

126.    On March 30, 2023, Ford issued a second recall (Recall No. 23V-199) for the Defect, covering certain 2020–2022 Ford Explorers. Ford acknowledged that the vehicles in this recall "received a previous Powertrain Control Module update which did not include an Electronic Parking Brake apply when the vehicle was shifted into park, as intended."  Ford listed the cause of this as "[t]he recall program was launched before all the software calibrations were available for dealers." According to the chronology submitted with the recall, Ford became aware of this problem in January 2023.

127.    Ford's purported fix was not to replace defective one-bolt subframes with two-bolt subframes. Rather, the recall provided for an update to the parking brake software intended to address a stationary failure. This did nothing to prevent the one-bolt design from failing; nor does it address the possibility that subframe failure could lead to the loss of control or impaired drivability.

128.    If the driveshaft/half shafts become disconnected, resulting in a loss of

transmission torque to the rear wheels, the vehicle will lose power while in motion. The driver can also lose complete control of the vehicle. In such cases, a software update that engages the Electronic Parking Brake when in Park does nothing to remedy the Defect. Rather, it requires consumers to brave the safety risks of the Defect before an adequate remedy is provided under warranty. Discovery will show that the problem persists despite Ford's software update Recall, as a result of the Defect as described herein.

129.   On October 6, 2023, Ford issued yet another recall (Recall No. 23S55) on 238,364 2020–2022 Ford Explorers ("2023 Recall"). Once again, the purported fix does not involve replacing defective one-bolt subframes with two-bolt subframes. Rather, the 2023 Recall involves replacing the rear bushing and replacing the single bolt with what appears to be an identical single bolt. Moreover, the Recall involved replacing the bushing with a new bushing of the same length. However, simply replacing the bolt and bushing does nothing to address the fundamental flaw of the one-bolt design: it does not spread the load from the differential like the two-bolt design subjects that single bolt to excessive torque. Moreover, the 2023 Recall does not address all affected vehicles and does not address Plaintiffs' damages, including damages for overpayment at the point of sale.

130.   In January 2024, Ford released Customer Satisfaction Program ("CSP") 24N01. This CSP acknowledged that:

In some of the affected vehicles, the rear axle bolt may fracture. A fractured rear axle bolt will allow the rear axle housing to move out of position, resulting in severe noise and vibration. If the rear axle bolt breaks, the driveshaft or half shafts may become disconnected, resulting in loss of transmission torque to the rear wheels. Transmission torque is necessary to hold the vehicle in park and is also needed for the vehicle to move forward or backward.

131.    However, rather than repairing the defective Rear Subframe Assembly for all impacted models, the CSP only reimburses owners for the repair after the rear subframe mounting bolt has fractured. This insufficient action requires that owners wait until their vehicles have failed while being driven to receive an adequate repair for the Defect.

**Ford Was Aware of Numerous Consumer Complaints About the Defect**

132.    Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential automobile defects, and it imposes a legal requirement (backed by criminal penalties) compelling automakers to make confidential disclosure of defects and related data to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act*, Pub. L. No. 106-414, 114 Stat.1800 (2000).

133.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential

defects in their vehicles, including those that are safety related. *Id.* Thus, Ford knew or should have known of the many complaints about the Mounting Bolt Defect logged by the NHTSA Office of Defects Investigation (ODI). *See* Ex. 1 attached. The content, consistency, and disproportionate number of these complaints alerted, or should have alerted, Ford to the Mounting Bolt Defect.

134.   With respect solely to the Class Vehicles, Ex. 1 includes but a few examples of the many complaints concerning the Mounting Bolt Defect available through NHTSA's website, www.safercar.gov. These complaints further demonstrate that Ford was or should have been aware of the Mounting Bolt Defect.

135.   Similarly, complaints posted by consumers in internet forums demonstrate that the Defect is widespread and dangerous and that it can manifest without warning. The complaints also indicate Ford's awareness of the problems with the rear subframe and how potentially dangerous the Defect is for consumers, not only to the extent such complaints reference contact with Ford itself, but also because Ford employs staff to monitor the perception of the brand. *See* Ex. 1.

136.   On June 20, 2023, NHTSA opened an investigation into rear- axle- bolt failures in 2020–2022 Ford Explorers. NHTSA estimated there were 710,253 of these vehicles. NHTSA noted that the previous recalls "addressed the rear axle horizontal mounting bolt that may fracture and cause the driveshaft to disconnect. The fracturing of the rear axle bolt can allow the rear axle housing to move out of

position, resulting in severe noise, vibration and/or a disconnected driveshaft . . . . Ford's remedy was to add a software update which automatically applies the electronic service parking brake to keep the vehicle from rolling away in the event of a driveshaft failure.  However, **there is no safety remedy addressing the failed rear axle horizontal mounting bolt which is the basis of this safety issue and the cause of the impaired vehicle**." (emphasis added).

137.   NHTSA had opened the investigation after receiving two reports of consumers alleging motive power loss or loss of transmission torque as a result of the rear- axle- bolt failures, despite having been serviced by the recalls.  In fact, Class Members made multiple reports to NHTSA regarding problems they experienced as a result of their Class Vehicles receiving the Recall.  *See* Ex. 1.

## Ford Has Actively Concealed the Mounting Bolt Defect

138.   Despite its knowledge of the Mounting Bolt Defect in the Class Vehicles, Ford actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Ford failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)    any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the rear subframe;

41

(b)     that the Class Vehicles, including the rear subframe, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)     that the Class Vehicles and their rear subframes were defective, despite the fact that Ford learned of such defects as early as 2019, if not earlier.

139.   As discussed above, Ford monitors its customers' discussions on online forums, and actively concealed the Defect by denying the existence of a defect, and blaming the class members and a purported lack of maintenance for the problems.

140.   Ford has conveyed to consumers that their vehicles are functioning properly and fail to provide an adequate remedy. For example, a software update may be implemented, but the rear subframe will only be replaced if the rear subframe bolt fails.

141.   Ford's various recalls have further served to conceal the Defect as its ineffective recalls obscure and conceal the true extent of the Defect from Class Members.

142.   Despite Ford's knowledge of the Defect, Ford has caused Plaintiffs and Class Members to expend money and/or time to diagnose, repair or replace the Class Vehicles' rear subframe and/or related components, despite Ford's knowledge of the Mounting Bolt Defect.

## Ford Unjustly Retained Substantial Benefits

143.  Ford unlawfully failed to disclose the Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

144.  Plaintiffs further allege that Ford thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles.

145.  Specifically, Plaintiffs purchased their vehicles and/or parts needed to attempt repairs to their vehicles from Ford authorized dealerships.  Those dealerships purchased those vehicles and/or components from Ford.

146.  As discussed above therefore, Plaintiffs allege that Ford unlawfully induced them to purchase their respective Class Vehicles and/or components for their Class Vehicles by concealing and/or omitting a material fact (the Mounting Bolt Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Mounting Bolt Defect.

147.  Moreover, because Plaintiffs are likely to need further replacements of the engines in the future, they will be forced to purchase more defective components from Defendant absent some relief which forces the Defendant to correct the defective components.

148.  Accordingly, Ford's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that did - and likely will continue to - deceive consumers, should be disgorged.

**The Vehicle Warranties Instruct Plaintiffs to Seek Repairs at Authorized Dealerships**

149.   Ford provided all purchasers or lessees of the Class Vehicles with the NVLW. The terms of this warranty are non-negotiable, and Ford exercises sole authority in determining whether and to what extent a particular repair is covered under the warranties it offers.

150.   The NVLW provided by Ford includes basic bumper to bumper warranty coverage, and states, in relevant part:

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if:
>
> - your Ford vehicle is properly operated and maintained, and
>
> - was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

151.   To sell vehicles to the general public, Ford enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiffs while also advertising the warranties it provides directly to consumers when they purchase a Ford-branded vehicle from the authorized dealership. These

agreements specifically authorize the dealerships to provide repairs under the warranties Ford provides directly to consumers.

152. Accordingly, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase vehicles and receive warranty repairs locally. Discovery will show that because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreements, which create an implied warranty of merchantability of the goods being sold by these authorized dealerships, they may avail themselves of the implied warranty against Ford. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

153. Plaintiffs and each of the members of the Class are the intended beneficiaries of the express and implied warranties that accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Ford. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

154. Ford issued the express warranty to Plaintiffs and the Class Members.

Ford also developed and disseminated the owner's manuals and warranty booklets that direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. Ford also developed and disseminated the advertisements, such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles, which promoted the terms of the warranties that they issue with the sale of each Class Vehicle. Ford is also responsible for the content of the Monroney Stickers on its vehicles. Because Ford issues the express warranties directly to consumers, Plaintiffs and Class Members are in direct privity with Ford with respect to the warranties.

155.   Defendant issued the express warranties to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Moroney Stickers on Defendant-branded vehicles.

## **Equitable Relief Is Necessary**

156.   Recourse to the equitable powers of the Court, and relief in equity, is necessary here in order to provide full and complete relief to Class Members.  This is particularly true because Ford's recall may provide some relief, but fails to provide all of the relief necessary to make consumers whole, and legal remedies are also inadequate.

157.    First, Plaintiffs, on behalf of themselves and the Class Members, seek equitable relief in this matter in the form of prospective injunctive relief.

158.    Plaintiffs seek an injunction requiring Ford issue a prompt, complete, and effective repair of the Mounting Bolt Defect and all related components unduly worn or damaged due to the defect's presence.

159.    Additionally, Plaintiffs seek an injunction requiring Ford to provide fulsome and comprehensive notice to each Class Member regarding the existence of the Mounting Bolt Defect in their vehicles, Ford's knowledge thereof, the attendant risks to vehicle componentry, the attendant safety concerns and risks, and the availability of any relief available, including through the recall.  Ford sent notice of the recall to only a limited group of current owners; Ford should be compelled to provide notice to every current and former registered owner of the Class vehicles.

160.    To that end, Plaintiffs seek an injunction requiring Ford to acquire the contact information, including addresses for direct mail notice, associated with each Class Vehicle's VIN number, from the Departments of Motor Vehicles of the fifty states, which is done routinely in connection with class certification in automotive defect cases, and to send direct-mail notice containing the above-referenced disclosures to each Class Member, including current owners or lessees, former owners or lessees, and former owners/lessees who disposed of their vehicles due to the existence of the Mounting Bolt Defect.

161.    Unless restrained by this Court and supervised by putative Class Counsel, Ford will not provide adequate relief to Class Members. Ford will not acquire the addresses of all Class Members, including current and former owners/lessees, from the Departments of Motor Vehicles of the fifty states. Ford will not send direct mail notice with complete disclosures regarding its knowledge of the Mounting Bolt Defect, its effect on the vehicles' componentry, its attendant safety risks, and the availability of a prompt, complete, and effective fix for the Mounting Bolt Defect in all Class Vehicles and fixing related componentry prematurely worn or otherwise damaged by the Mounting Bolt Defect's effects.

162.    Plaintiffs further seek injunctive relief to require Ford to provide reimbursement for all costs of repair and related costs, such as towing, rental cars, and other costs, and to require such reimbursement claims to be handled by an independent third-party administrator to ensure fairness.

163.    Plaintiffs also seek equitable relief in the form of restitution, credit-repair, and other compensation for Class Members who, because of the high cost of repairing their vehicle after failure, sold or traded the vehicle for less than fair market value, had the vehicle repossessed, or were forced to continue making payments on a non-functioning vehicle.  Ford's recall does absolutely nothing to compensate Class Members who could not afford to replace their engine and therefore either sold or traded their vehicle, or had it repossessed, or owned a non-functioning vehicle.

The Court can and should exercise its discretion to afford equitable relief to such Class Members.

164.   Additionally, many Class Members have been without the use of their vehicle while they await repairs.  The Court can and should exercise its discretion to afford equitable relief to such Class Members. Ford should be required to provide repairs within a reasonable time, provide rental car reimbursement, or provide other relief that fairness requires.

165. Legal remedies are inadequate to obtain the above-referenced outcomes, including fulsome and complete notice to all Class Members, including notice of the active and ongoing downstream mechanical effects of the unrepaired Mounting Bolt Defect and notice of the defect's safety risks. Nor are legal remedies adequate to compel Ford to devise a prompt, complete, and effective fix that can be applied to each Class Vehicle. Nor are legal remedies equally as prompt, certain, and in other ways efficient to provide notice to the Class Members and a fulsome and prompt fix to their vehicles.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

166.   Any applicable statute of limitations has been tolled by Ford's knowing and active concealment of the Mounting Bolt Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not

reasonably discover the Mounting Bolt Defect or Ford's deception with respect to the Mounting Bolt Defect. Ford continues to deny the existence and extent of the Mounting Bolt Defect, even when questioned by Plaintiffs and members of the Class. Instead, Ford decided to release an ineffective software update as a "recall" for the Mounting Bolt Defect.

167.    Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Ford was concealing a defect and/or that the Class Vehicles contained the Mounting Bolt Defect and the corresponding safety risk. As alleged herein, the existence of the Mounting Bolt Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Mounting Bolt Defect or that the Ford was concealing the Mounting Bolt Defect.

168.    At all times, Ford is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Mounting Bolt Defect and corresponding safety risk due to its exclusive and superior knowledge of the existence and extent of the Mounting Bolt Defect in Class Vehicles.

169.    Ford knowingly, actively, and affirmatively concealed the facts alleged

herein. Plaintiffs and members of the Class reasonably relied on Ford's knowing, active, and affirmative concealment.

170.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Ford's fraudulent concealment, and Ford is estopped from relying on any statutes of limitations in defense of this action.

## VI.   <u>CLASS ALLEGATIONS</u>

171.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes:

> **<u>Nationwide Class:</u>** All persons or entities who purchased or leased one or more Class Vehicle.
>
> **<u>Alabama Sub-Class:</u>** All persons or entities who purchased or leased one or more Class Vehicle in the State of Alabama.
>
> **<u>Florida Sub-Class:</u>** All persons or entities who purchased or leased one or more Class Vehicle in the State of Florida.
>
> **<u>Maryland Sub-Class:</u>** All persons or entities who purchased or leased one or more Class Vehicle in the State of Maryland.
>
> **<u>Nevada Sub-Class:</u>**   All persons or entities who purchased or leased one or more Class Vehicle in the State of Nevada.
>
> **<u>Tennessee Sub-Class:</u>** All persons or entities who purchased or leased one or more Class Vehicle in the State of Tennessee.

**Texas Sub-Class:** All persons or entities who purchased or leased one or more Class Vehicle in the State of Texas.

172.   The Alabama Sub-Class, Florida Sub-Class, Maryland Sub-Class, Nevada Sub-Class, Tennessee Sub-Class, and Texas Sub-Class are collectively referred to herein as the "State Sub-Classes."  Plaintiffs assert claims under the federal law or the law of each state as set forth below.

173.   Excluded from each Class are individuals who have personal injury claims caused by the Defective Class Vehicles. Also excluded from the Class are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

174.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class- wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

175.   This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

176.   **Numerosity:** Federal Rule of Civil Procedure 23(a)(1): The members

of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

177.   **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)   Whether Ford engaged in the conduct alleged herein;

b)   Whether the Mounting Bolt Defect creates an unreasonable safety risk in the Class Vehicles;

c)   When Ford first knew about the Mounting Bolt Defect;

d)   Whether Ford designed, manufactured, marketed, and distributed the Class Vehicles with defective rear subframe assemblies;

e)   Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

f)   Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Classes;

g)      Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

h)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

178.   **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

179.   **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

180.   **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford,

so it would be impracticable for the members of the Classes to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.  <u>CLAIMS</u>

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq*.)
### (On behalf of the Nationwide Class or, in the alternative,
### Their Respective State Sub-Classes)

181.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

182.   Plaintiffs bring this claim on behalf of the Nationwide Class and, in the alternative, on behalf of their Respective State Sub-Class.

183.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

184.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable

state law to enforce against the warrantor the obligations of its implied warranties.

185.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

186.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

187.   Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Class Vehicles' Subframe Assemblies were fit for their ordinary purpose as safe and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

188.   Ford breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with the defective rear suspension assembly making the vehicles susceptible to a risk of failure and loss of control during operation, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles and passengers, bystanders, other vehicle occupants, pedestrians and

property. This defect rendered the Class Vehicles, when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

189.  As discussed above, on information and belief, Ford skimped on available safety technologies that could have prevented the subframe disconnection risk, and, through testing done prior to launching the Class Vehicles, Ford knew or should have known of the defect. Yet, in order to pad its bottom line Ford intentionally or recklessly foisted the unreasonably dangerous Class Vehicles on unwitting class members.

190.  Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

191.  Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

192.  Any limitations Ford might seek to impose on its warranties are substantively unconscionable.  Ford knew that the Class Vehicles were defective and that they could when used as intended long before Plaintiffs and the Class could or would discern the existing defect.  Ford failed to adequately disclose the Defect to Plaintiffs and the Class. Thus, any attempted enforcement of the durational

limitations on the warranties is harsh and would shock the conscience.

193.   Plaintiffs have had sufficient direct dealings with Ford, including being the targeted audience of Ford's marketing, to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as the defect presents an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as to  property, and vehicles, passengers, pedestrians and bystanders.

194.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

195.   Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any

payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

196.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including overpayment for their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

197.   Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the Defect in their Class Vehicles.

**COUNT II**
**FRAUDULENT CONCEALMENT**
**(COMMON LAW)**
**(On behalf of the Nationwide Class or,**
**in the alternative, the State Sub-Classes)**

198.   Plaintiffs reallege and incorporate by reference all paragraphs as though

fully set forth herein.

199.    Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of their respective State Sub-Classes.

200.    A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Class Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Class Vehicles, or (b) knowingly concealed material information in connection with the sale or lease of the Class Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Class Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

201.    Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

202.    Ford sold the Class Vehicles to Plaintiffs without disclosing the true nature of the Defect, including the Risk, and concealed and suppressed the defect from regulators and consumers.

203.    Ford concealed and suppressed the true nature of the Class Vehicles, as well as the risk, with the intent to deceive Plaintiffs.

204.   Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Class Vehicles, with the intent to deceive Plaintiffs into believing it was rectifying the Defect.

205.   Ford did so in order to falsely assure purchasers, lessees, and owners of the Class Vehicles that the vehicles they were purchasing or leasing were safe and to avoid costs and the requisite safety technology and/or rigorous testing of the subframe assemblies prior to launching the Class Vehicles, and then to avoid for a substantial period of time the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Class Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

206.   Ford had a duty to disclose the true nature of the Class Vehicles, as well as the Defect because it was known and/ only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs.  Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Class Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Defect. Having provided information to Plaintiffs, Ford had the duty to disclose not just the partial truth, but the entire truth. Finally, once the Class Vehicles were on the road, Ford had a duty to monitor the

vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

207.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

208.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding the Defect, well as whether the "Recall Repair" actually repairs the Defect of the Class Vehicles.

209.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Class Vehicles and paid the high premium as the result of Ford's claims that they could be safely operated. Plaintiffs' actions were justified.  Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

210.   Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage. In purchasing or leasing their Class Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the Defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy

the Defect. Those Class members who sold their dangerous Class Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiffs been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

211.   Accordingly, Ford is liable to Plaintiffs, the Nationwide Class and/or the State Sub-Classes for damages in an amount to be proven at trial.

212.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## FRAUDULENT OMISSION
### (On behalf of the Nationwide Class or,
### in the alternative, the State Sub-Classes)

213.   Plaintiffs and reallege and incorporate by reference all paragraphs as though fully set forth herein.

214.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of their respective State Sub-Classes.

215.   Ford was aware of the Defect within the Class Vehicles, as well as the

true nature of the Class Vehicles as a whole, when it marketed and sold the Class Vehicles to Plaintiffs and the Nationwide Class and/or State Sub-Classes ("Classes").

216.   Having been aware of the Defect within the Class Vehicles, as well as the true nature of the Class Vehicles as a whole, and having known that Plaintiffs and the other members of the Nationwide Class and/or State Sub-Classes could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiffs and the other members of the Classes in connection with the sale or lease of the Class Vehicles.

217.   Ford did not disclose the Defect or the true nature of the Class Vehicles to Plaintiffs and members of the Classes in connection with the sale or lease of the Class Vehicles.

218.   For the reasons set forth above, the Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

219.   In purchasing and leasing the Class Vehicles, Plaintiffs and the other members of the Classes reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.

220.   Had Plaintiffs and the other members of the Classes known of the true nature of the Class Vehicles, including the Defect, they would not have purchased

or leased the Class Vehicles or would have paid less for the Class Vehicles.

221.   Through its omissions regarding the true nature of the Class Vehicles, as well as the Defect, Ford intended to induce, and did induce, Plaintiffs and the other members of the Classes to either purchase or lease a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

222.   As a direct and proximate result of Ford's omissions, Plaintiffs and the other members of the Nationwide Class and State Sub-Classes either overpaid (i.e., did not receive the benefit of their bargain) for the Class Vehicles or would not have purchased the Class Vehicles at all if the true nature of the Class Vehicles, including the Defect, had been disclosed to them and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(On behalf of the Nationwide Class or,**
**in the alternative, the State Sub-Classes)**

223.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

224.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Sub-Classes. A Nationwide Class is appropriate because the elements of unjust enrichment are

uniform in all the states.

225.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

226.   Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

227.   Ford has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of Ford's conduct, and Plaintiffs, Nationwide Class Members and State Sub-Class members have overpaid for the Class Vehicles and been forced to pay other costs.

228.   Thus, Plaintiffs, members of the Nationwide Class and members of the State Sub-Classes conferred a benefit on Ford.

229.   It is inequitable for Ford to retain these benefits.

230.   Plaintiffs, Nationwide Class Members and State Sub-Class members were not aware of the true facts about the Class Vehicles and did not benefit from Ford's conduct.

231.   Ford knowingly accepted the benefits of its unjust conduct.

232.   As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**COUNT V**
**VIOLATIONS OF ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**(Ala. Code § 8-19-1, *et seq.*)**
**(On behalf of the Alabama Sub-Class)**

233.   Plaintiffs Alex Samuels and James Kohen ("Plaintiffs," for the purposes of this claim) and the Alabama Sub-Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

234.   Plaintiffs bring this claim on behalf of themselves and the Alabama Sub-Class.

235.   Plaintiffs, members of the Alabama Sub-Class, and Ford are "persons" within the meaning of the Alabama Deceptive Trade Practices Act ("Alabama DTPA") Ala. Code § 8-19-3(5).

236.   Plaintiffs and the Alabama Sub-Class are "persons" within the meaning of Ala. Code § 8-19-3(2).

237.   The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

238.   Ford was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

239.   The Alabama DTPA declares several specific actions to be unlawful, including: "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

240.   Ford participated in unfair or deceptive trade practices that violated the Alabama DTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as

safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Mounting Bolt Defect in the course of its business.

241.    Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

242.    Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

243.    Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

244.    Ford knew or should have known that its conduct violated the Alabama DTPA.

245.    Ford was under a duty to Plaintiffs and the Alabama Sub-Class

Members to disclose the defective nature of the Class Vehicles because:

246.   Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

247.   Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

248.   Ford actively concealed the defective nature of the Class Vehicles from Plaintiffs and the Alabama Sub-Class Members at the time of sale and thereafter.

249.   By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

250.   The facts concealed or not disclosed by Ford to Plaintiff and the Alabama Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Ford's Class Vehicles, or to pay less for them. Whether a vehicle's rear subframe is defective, which can cause the rear differential and rear axles to detach from the driveshaft, and rollaway when parked, is a material safety concern. Had Plaintiffs and the Alabama Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

251.   Plaintiffs and the Alabama Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is

the reasonable and objective consumer expectation for vehicles.

252.   As a result of Ford's misconduct, Plaintiffs and the Alabama Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

253.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiffs and the Alabama Sub-Class Members have suffered and will continue to suffer actual damages.

254.   On August 8, 2023, Plaintiffs made a written demand on Ford for relief for himself and the Alabama Sub-Class Members. Plaintiff's demand met any applicable requirements of Ala. Code § 8-19-10 (e).

255.   Ford's violations present a continuing risk to Plaintiffs and the Alabama Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

256.   Ford is liable to Plaintiffs and the Alabama Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and other remedies the Court may deem appropriate under Ala. Code § 8-19-1. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

**COUNT VI**
**BREACH OF EXPRESS WARRANTY**
**(Ala. Code §§ 7-2-313 AND 7-2A-210)**
**(On behalf of the Alabama Sub-Class)**

257.   Plaintiffs Alex Samuels and James Kohen ("Plaintiffs," for the

purposes of this claim) and the Alabama Sub-Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

258.   Plaintiffs bring this claim on behalf of themselves and the Alabama Sub-Class.

259.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

260.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

261.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

262.   The Rear Subframe Assemblies were manufactured and/or installed in the Class Vehicles by Ford and are covered by the express warranty.

263.   Ford provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Ford's express warranty is an express warranty under Alabama state law.

264.   According to Ford, the "Bumper-to-Bumper Coverage is for the first 3 years or 36,000 miles, whichever comes first," if not longer.

265.   Ford's NVLW and other warranties regarding the Class Vehicles

formed a basis of the bargain that was breached when Plaintiffs and members of the Alabama Sub-Class purchased or leased the Class Vehicles with the defective rear subframe assemblies and/or related components.

266.   Plaintiffs and members of the Alabama Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Ford failed to inform Plaintiffs and members of the Alabama Sub-Class that the Class Vehicles were equipped with defective Rear Subframe Assemblies and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Mounting Bolt Defect.

267.   Ford breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Ford and then failing to do so. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

268.   Privity is not required here because Plaintiffs and members of the Alabama Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements

provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

269.   Any attempt by Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because Ford knowingly sold or leased defective products without informing consumers about the Mounting Bolt Defect. The time limits are unconscionable and inadequate to protect Plaintiffs and the members of the Alabama Sub-Class.  Among other things, Plaintiffs and members of the Alabama Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Ford and unreasonable favored Ford. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Mounting Bolt Defect existed between Ford and members of the Alabama Sub-Class.

270.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the members of the Alabama Sub-Class whole, because Ford has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

271.   Plaintiffs were not required to notify Ford of the breach because

affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Mounting Bolt Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

272.   Nonetheless, Plaintiffs and members of the Alabama Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized providers of warranty repairs.  Plaintiffs also provided notice to Ford of its breach of express warranty by letter dated August 8, 2023.

273.   As a result of Ford's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

274.   As a direct and proximate result of Ford's breach of express warranties, Alabama Plaintiffs and members of the Alabama Sub-Class have been damaged in an amount to be determined at trial.

275.   As a result of Ford's breach of the express warranty, Alabama Plaintiffs and Alabama Sub-Class Members are entitled to legal and equitable relief against Ford, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VII
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Ala. Code §§ 7-2-313 AND 7-2A-210)
### (On behalf of the Alabama Sub-Class)

74

276.   Plaintiffs Alex Samuels and James Kohen ("Plaintiffs," for the purposes of this claim) and the Alabama Sub-Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

277.   Plaintiffs bring this claim on behalf of themselves and the Alabama Sub-Class.

278.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and a "seller" of motor vehicles under § 7-2-103(1)(d).

279.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

280.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

281.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ala. Code §§ 7-2-314 and 7-2A-212.

282.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Alabama Plaintiffs and members of the Alabama Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class

Vehicles would and did pass unchanged from the authorized dealers to Alabama Plaintiffs and members of the Alabama Sub-Class, with no modification to the defective Class Vehicles.

283.   Ford provided Alabama Plaintiffs and members of the Alabama Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their rear subframe assemblies suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

284.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

285.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

286.   As a result of Ford's breach of the applicable implied warranties, Plaintiffs and members of the Alabama Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Mounting Bolt Defect, Plaintiffs and members of the Alabama Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

287.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

288.   Plaintiffs and members of the Alabama Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

289.   Privity is not required here because Plaintiffs and members of the Alabama Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements

provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

290.   Plaintiffs and members of the Alabama Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Mounting Bolt Defect from the complaints and service requests it received from Plaintiffs and the Class Members and through other internal sources.

291.   Nonetheless, Plaintiffs and members of the Alabama Sub-Class provided notice to Ford of the breach of implied warranties when they took their vehicles to Ford-authorized provider of warranty repairs.  Plaintiffs also provided notice to Ford of its breach of implied warranty by letter dated August 8, 2023.

292.   As a direct and proximate cause of Ford's breach, Plaintiffs and members of the Alabama Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs and members of the Alabama Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

293.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and members of the Alabama Sub-Class have been damaged in an amount to be proven at trial.

## COUNT VIII
## VIOLATIONS OF FLORIDA'S UNFAIR & DECEPTIVE TRADE
## PRACTICES ACT
### (Fla. Stat. § 501.201, *et seq*.)
### (On behalf of the Florida Sub-Class)

294.   Plaintiff John Wiggins ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

295.   Florida Plaintiff brings this cause of action individually and on behalf of the members of the Florida Sub-Class against Ford.

296.   Plaintiff and members of the Florida Sub-Class are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

297.   Ford engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

298.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).

299.   Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FUDTPA.

300.   Ford participated in unfair or deceptive trade practices that violated the FUDTPA. By failing to disclose the Defect, by concealing the Defect, by marketing

its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and that stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Mounting Bolt Defect in the course of its business.

301. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment in connection with the sale of the Class Vehicles.

302. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

303. Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

304. Ford knew or should have known that its conduct violated the FUDTPA.

305. Ford had a duty to Plaintiff and Class Members because:

    a. Ford was in a superior position to know the true state of facts about

the safety defect in the Class Vehicles;

b. Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c. Ford actively concealed the defective nature of the Class Vehicles at the time of sale and thereafter.

306.   By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

307.   The facts Ford concealed or failed to disclose are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease the Class Vehicles, or what to pay for them. Whether a vehicle's rear subframe is defective, which can cause the rear differential and rear axles to detach from the driveshaft and rollaway when parked, is a material safety concern. Had Plaintiff and Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

308.   Reasonable consumers do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

309.   As a result of Ford's misconduct, Plaintiff and the Class Members have been harmed and have suffered actual damages in that the Class Vehicles are

defective and require repairs or replacement.

310.   Ford's violations present a continuing risk to Plaintiff and the Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

**311.**   Ford is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate, including injunctive relief. The Court should also exercise its discretion to increase the award of damages to each Class Member by three times their actual damages to the maximum extent permitted by statute.

**COUNT IX**
**BREACH OF EXPRESS WARRANTY**
**(F.S.A. §§ 672.313 and 680.21)**
**(On behalf of the Florida Sub-Class)**

312.   Plaintiff John Wiggins ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

313.   Plaintiff brings this cause of action individually and on behalf of the members of the Florida Sub-Class against Ford.

314.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

315. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

316. The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

317. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

318. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles and their rear subframe assemblies within the warranty period.

319. Ford's express warranty, the "New Vehicle Limited Warranty," provides, in relevant part, that Ford will provide warranty services when the vehicle is brought to an authorized Ford dealer. The authorized Ford dealer will without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. Ford designed, manufactured and/or installed the Rear Subframe Assemblies and the Rear Subframe Assemblies' component parts in the Class Vehicles, and the Rear Subframe Assemblies and their component parts are covered by the express warranties.

320. The Mounting Bolt Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiff and the Florida Sub-Class Members.

321. Plaintiff and the Florida Sub-Class Members relied on Ford's express

warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

322.    Under the express warranties, Ford was obligated to correct the Mounting Bolt Defect in the vehicles owned or leased by Plaintiff and the Florida Sub-Class Members.

323.    Although Ford was obligated to correct the Mounting Bolt Defect, none of the attempted fixes to the Mounting Bolt Defect are adequate under the terms of the warranties, as they did not cure the defect.

324.    Ford breached the express warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranties, Ford falsely informed Florida Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Rear Subframe Assemblies with equally defective components, without actually repairing the Class Vehicles.

325.    Ford has failed and refused to conform the Rear Subframe Assemblies to the express warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

326.    Moreover, Ford's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly

sold a defective product without informing consumers about the defect.

327. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff and the Florida Sub-Class Members. Among other things, Plaintiff and the Florida Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class Members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

328. Plaintiff and the Florida Sub-Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

329. Plaintiff and the Florida Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure their breach of written warranty would have been futile. Ford was also on notice of the Mounting Bolt Defect from the complaints and service requests they received from Plaintiff and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal and external sources.

330. Because Ford, through their conduct and exemplified by their own service bulletins, have covered repairs of the Mounting Bolt Defect if Ford

determines the repairs are appropriately covered under the warranties, Ford cannot now deny that the warranties cover the Mounting Bolt Defect.

331.   Because Ford has not been able to remedy the Mounting Bolt Defect, any limitation on remedies included in the warranties causes the warranties to fail their essential purposes, rendering them null and void.

332.   As a direct and proximate cause of Ford's breach, Plaintiff and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

333.   As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the Florida Sub-Class Members have been damaged in an amount to be determined at trial.

### COUNT X
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (F.S.A. §§ 672.314 and 680.212)
### (On behalf of the Florida Sub-Class)

334.   Plaintiff John Wiggins ("Plaintiff" for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

335.   Plaintiff brings this cause of action individually and on behalf of the members of the Florida Sub-Class against Ford.

336.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

337.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

338.   The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

339.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

340.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the Mounting Bolt Defect to customers through authorized dealers, like those from whom laintiff and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiff and the Florida Sub-Class Members, with no modification to the defective Rear Subframe Assemblies.

341.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for

the ordinary purposes for which they were sold.

342.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Rear Subframe Assemblies that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Rear Subframe Assemblies would be fit for their intended use while the Class Vehicles were being operated.

343.   Contrary to the applicable implied warranties, the Class Vehicles and their Rear Subframe Assemblies, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design, installation, and manufacture of their Rear Subframe Assemblies and the existence of the Mounting Bolt Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

344.   As a result of Ford's breach of the applicable implied warranties, Plaintiff and the Florida Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Mounting Bolt Defect, Plaintiff and the Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Rear Subframe

Assemblies components are substantially certain to fail before their expected useful life has run.

345.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of F.S.A. §§ 672.314 and 680.212.

346.   Plaintiff and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

347.   Plaintiff and the Florida Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure their breach of implied warranty would have been futile. Ford were also on notice of the Mounting Bolt Defect from the complaints and service requests they received from Plaintiff and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal sources.

348.   Because Plaintiff purchased their vehicles and received the remainder of the transferable warranties provided directly by Ford, they have privity with Ford and are also the intended third-party beneficiaries of Ford's implied warranties and the contracts between Ford and their authorized dealers for the purposes of warranty repairs.

349.   As a direct and proximate cause of Ford's breach, Plaintiff and the

Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

350.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

**COUNT XI**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(Md. Code Ann., Com. Law § 13-101, *et seq*.)**
**(On behalf of the Maryland Sub-Class)**

351.   Plaintiff Bradley Caricofe ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

352.   Plaintiff brings this cause of action individually and on behalf of the members of the Maryland Sub-Class against Ford.

353.   Plaintiff, members of the Maryland Sub-Class, and Ford are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

354.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular

standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302.

355.    Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Maryland CPA.

356.    Ford participated in unfair or deceptive trade practices that violated the Maryland CPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Mounting Bolt Defect in the course of its business.

91

357.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

358.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

359.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

360.   Ford knew or should have known that its conduct violated the Maryland CPA.

361.   Ford was under a duty to Plaintiff and the Maryland Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> a.  Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> b.  Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and
>
> c.  Ford actively concealed the defective nature of the Class Vehicles

from Plaintiff and the Maryland Sub-Class Members at the time of sale and thereafter.

362.   By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

363.   The facts concealed or not disclosed by Ford to Plaintiff and the Maryland Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Ford's Class Vehicles, or to pay less for them. Whether a vehicle's rear subframe is defective, which can cause the rear differential and rear axles to detach from the driveshaft, and rollaway when parked, is a material safety concern. Had Plaintiff and the Maryland Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

364.   Plaintiff and the Maryland Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

365.   As a result of Ford's misconduct, Plaintiff and the Maryland Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

366.   As a direct and proximate result of Ford's unfair or deceptive acts or

practices, Plaintiff and the Maryland Sub-Class Members have suffered and will continue to suffer actual damages.

367.   Ford's violations present a continuing risk to Plaintiff and the Maryland Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

368.   Ford is liable to Plaintiff and the Maryland Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Md. Code Ann., Com. Law § 13-408. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

**COUNT XII**
**BREACH OF EXPRESS WARRANTY**
**(Md. Code Ann., Com. Law §§ 2-313 and 2A-210)**
**(On behalf of the Maryland Sub-Class)**

369.   Plaintiff Bradley Caricofe ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

370.   Plaintiff brings this cause of action individually and on behalf of the members of the Maryland Sub-Class against Ford.

371.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

372.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

373.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

374.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

375.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles and their rear subframe assemblies within the warranty period.

376.   Ford's express warranty, the "New Vehicle Limited Warranty," provides, in relevant part, that Ford will provide warranty services when the vehicle is brought to an authorized Ford dealer. The authorized Ford dealer will without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. Ford designed, manufactured and/or installed the Rear Subframe Assemblies and the Rear Subframe Assemblies' component parts in the Class Vehicles, and the Rear Subframe Assemblies and their component parts are covered by the express warranties.

377.   The Mounting Bolt Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs and the Maryland Sub-Class Members.

378.   Plaintiffs and the Maryland Sub-Class Members relied on Ford's

express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

379.    Under the express warranties, Ford was obligated to correct the Mounting Bolt Defect in the vehicles owned or leased by Maryland Plaintiffs and the Maryland Sub-Class Members.

380.    Although Ford was obligated to correct the Mounting Bolt Defect, none of the attempted fixes to the Mounting Bolt Defect are adequate under the terms of the warranties, as they did not cure the defect.

381.    Ford breached the express warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranties, Ford falsely informed Maryland Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Rear Subframe Assemblies with equally defective components, without actually repairing the Class Vehicles.

382.    Ford has failed and refused to conform the Rear Subframe Assemblies to the express warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

383.    Moreover, Ford's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly

sold a defective product without informing consumers about the defect.

384.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Maryland Plaintiffs and the Maryland Sub-Class Members. Among other things, Maryland Plaintiffs and the Maryland Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class Members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

385.   Maryland Plaintiffs and the Maryland Sub-Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

386.   Maryland Plaintiffs and the Maryland Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure their breach of written warranty would have been futile. Ford was also on notice of the Mounting Bolt Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal and external sources.

387.   Because Ford, through their conduct and exemplified by their own service bulletins, have covered repairs of the Mounting Bolt Defect if Ford

determines the repairs are appropriately covered under the warranties, Ford cannot now deny that the warranties cover the Mounting Bolt Defect.

388.   Because Ford has not been able to remedy the Mounting Bolt Defect, any limitation on remedies included in the warranties causes the warranties to fail their essential purposes, rendering them null and void.

389.   As a direct and proximate cause of Ford's breach, Maryland Plaintiffs and the Maryland Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiffs and the Maryland Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

390.   As a direct and proximate result of Ford's breach of express warranties, Maryland Plaintiffs and the Maryland Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT XIII
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Md. Code Ann., Com. Law §§ 2-313 and 2A-210)
### (On behalf of the Maryland Sub-Class)

391.   Plaintiff Bradley Caricofe ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

392.   Plaintiff brings this cause of action individually and on behalf of the

members of the Maryland Sub-Class against Ford.

393.  Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

394.  With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

395.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

396.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Md. Com. Law §§ 2-314 and 2A-212.

397.  Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the Rear Subframe Assemblies to customers through authorized dealers, like those from whom Maryland Plaintiffs and the Maryland Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Maryland Plaintiffs and the Maryland Sub-Class Members, with no modification to the defective Rear Subframe Assemblies.

398.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

399.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Rear Subframe Assemblies that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Rear Subframe Assemblies would be fit for their intended use while the Class Vehicles were being operated.

400.   Contrary to the applicable implied warranties, the Class Vehicles and their Rear Subframe Assemblies at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their Rear Subframe Assemblies and the existence of the Mounting Bolt Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

401.   As a result of Ford's breach of the applicable implied warranties, Maryland Plaintiffs and the Maryland Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a

result of the Mounting Bolt Defect, Maryland Plaintiffs and the Maryland Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Rear Subframe Assemblies components are substantially certain to fail before their expected useful life has run.

402.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Md. Com. Law §§ 2-314 and 2A-212.

403.   Maryland Plaintiffs and the Maryland Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

404.   Maryland Plaintiffs and the Maryland Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Mounting Bolt Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal sources.

405.   As a direct and proximate cause of Ford's breach, Maryland Plaintiffs and the Maryland Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution

of value of their Class Vehicles. Additionally, Maryland Plaintiffs and the Maryland Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

406.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Maryland Plaintiffs and the Maryland Sub-Class Members have been damaged in an amount to be proven at trial.

**COUNT XIV
BREACH OF EXPRESS WARRANTY
(Nev. Rev. Stat. §§ 104.2313 and 104A.2210)
(On behalf of the Nevada Sub-Class)**

407.   Plaintiff Stephen Jackson ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

408.   Plaintiff brings this cause of action individually and on behalf of the members of the Nevada Sub-Class against Ford.

409.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Nev. Rev. Stat. §§ 104.2104(1) and 104A.2103(3), and "sellers" of motor vehicles under § 104.2103(1)(c).

410.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

411.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

102

412.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

413.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles and their rear subframe assemblies within the warranty period.

414.   Ford's express warranty, the "New Vehicle Limited Warranty," provides, in relevant part, that Ford will provide warranty services when the vehicle is brought to an authorized Ford dealer. The authorized Ford dealer will without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. Ford designed, manufactured and/or installed the Rear Subframe Assemblies and the Rear Subframe Assemblies' component parts in the Class Vehicles, and the Rear Subframe Assemblies and their component parts are covered by the express warranties.

415.   The Mounting Bolt Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs and the Nevada Sub-Class Members.

416.   Plaintiffs and the Nevada Sub-Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

417.   Under the express warranties, Ford was obligated to correct the Mounting Bolt Defect in the vehicles owned or leased by Plaintiff and the Nevada

103

Sub-Class Members.

418.   Although Ford was obligated to correct the Mounting Bolt Defect, none of the attempted fixes to the Mounting Bolt Defect are adequate under the terms of the warranties, as they did not cure the defect.

419.   Ford breached the express warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranties, Ford falsely informed Nevada Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components in the Rear Subframe Assemblies with equally defective components, without actually repairing the Class Vehicles.

420.   Ford has failed and refused to conform the Rear Subframe Assemblies to the express warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

421.   Moreover, Ford's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

422.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff and the Nevada Sub-Class Members. Among other things, Plaintiff and the Nevada Sub-Class Members had no

meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class Members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

423.  Plaintiff and the Nevada Sub-Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

424.  Plaintiff and the Nevada Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure their breach of written warranty would have been futile. Ford was also on notice of the Mounting Bolt Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal and external sources.

425.  Because Ford, through their conduct and exemplified by their own service bulletins, have covered repairs of the Mounting Bolt Defect if Ford determines the repairs are appropriately covered under the warranties, Ford cannot now deny that the warranties cover the Mounting Bolt Defect.

426.  Because Ford has not been able to remedy the Mounting Bolt Defect, any limitation on remedies included in the warranties causes the warranties to fail

their essential purposes, rendering them null and void.

427.  As a direct and proximate cause of Ford's breach, Plaintiff and the Nevada Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff and the Nevada Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

428.  As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the Nevada Sub-Class Members have been damaged in an amount to be determined at trial.

**COUNT XV**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Nev. Rev. Stat. §§ 104.2314 and 104A.2212)**
**(On behalf of the Nevada Sub-Class)**

429.  Plaintiff Stephen Jackson ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

430.  Plaintiff brings this cause of action individually and on behalf of the members of the Nevada Sub-Class against Ford.

431.  Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Nev. Rev. Stat. §§ 104.2104(1) and 104A.2103(3), and "sellers" of motor vehicles under § 104.2103(1)(c).

432.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

433.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

434.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

435.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the Rear Subframe Assemblies to customers through authorized dealers, like those from whom Plaintiff and the Nevada Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiff and the Nevada Sub-Class Members, with no modification to the defective Rear Subframe Assemblies.

436.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

437.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Rear Subframe Assemblies that were manufactured,

supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Rear Subframe Assemblies would be fit for their intended use while the Class Vehicles were being operated.

438.   Contrary to the applicable implied warranties, the Class Vehicles and their Rear Subframe Assemblies at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their Rear Subframe Assemblies and the existence of the Mounting Bolt Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

439.   As a result of Ford's breach of the applicable implied warranties, Plaintiff and the Nevada Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Mounting Bolt Defect, Plaintiff and the Nevada Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Rear Subframe Assemblies components are substantially certain to fail before their expected useful life has run.

440.   Ford's actions, as complained of herein, breached the implied warranty

that the Class Vehicles were of merchantable quality and fit for such use in violation of Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

441.   Plaintiff and the Nevada Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

442.   Plaintiff and the Nevada Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Mounting Bolt Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal sources.

443.   As a direct and proximate cause of Ford's breach, Plaintiff and the Nevada Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff and the Nevada Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

444.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Nevada Sub-Class Members have been damaged in an amount to be proven at trial.

## COUNT XVI
## VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### (Nev. Rev. Stat. § 598.0903, *et seq*.)
### (On behalf of the Nevada Sub-Class)

445.   Plaintiff Stephen Jackson ("Plaintiff" for the purposes of this claim) realleges and incorporates by reference all paragraphs as though fully set forth herein.

446.   Plaintiff brings this cause of action individually and on behalf of the members of the Nevada Sub-Class against Ford.

447.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. § 598.0934.

448.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, et. seq., prohibits the use of deceptive trade practices in the course of business and occupation. Under Nevada law, deceptive trade practices include, but are not limited to, "[k]nowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease" or "[r]epresenting that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model." Nev. Rev. Stat. Ann. § 598.0915(5), (7). See also Nev. Rev. Stat. Ann. § 598.0915(9), (15), Nev. Rev. Stat. Ann. § 598.0925.

449.   Ford engaged in unlawful trade practices, and unfair or deceptive acts

or practices that violated the Nevada DTPA.

450.   Ford participated in unfair or deceptive trade practices that violated the Nevada DTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Mounting Bolt Defect in the course of its business.

451.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

452.   Ford's deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

453.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their

intended use.

454.   Ford knew or should have known that its conduct violated the Nevada DTPA.

455.   Ford was under a duty to Plaintiff and the Nevada Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.   Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.   Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Ford actively concealed the defective nature of the Class Vehicles from Plaintiff and the Nevada Sub-Class Members at the time of sale and thereafter.

456.   By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

457.   The facts concealed or not disclosed by Ford to Plaintiff and the Nevada Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Ford's Class Vehicles, or to pay less for them. Whether a vehicle's rear subframe is defective, which can cause the rear differential and rear axles to detach from the driveshaft, and rollaway when parked, is a material safety concern. Had Plaintiff and

the Nevada Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

458.   Plaintiff and the Nevada Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

459.   As a result of Ford's misconduct, Plaintiff and the Nevada Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

460.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiff and the Nevada Sub-Class Members have suffered and will continue to suffer actual damages.

461.   Ford's violations present a continuing risk to Plaintiff and the Nevada Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

462.   Ford is liable to Plaintiff and the Nevada Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Nev. Rev. Stat. § 598.3982. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

463.    Pursuant to Nev. Rev. Stat. § 41.600, the Plaintiff and Nevada Sub-Class Members also seek an order enjoining Defendant's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Nevada DTPA.

**COUNT XVII**
**VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT**
**(Tenn. Code Ann. § 47-18-101, *et seq*.)**
**(On behalf of the Tennessee Sub-Class)**

464.    Plaintiff Cathy Carroll ("Plaintiff" for the purposes of this claim) brings this cause of action on behalf of herself and on behalf of the members of the Tennessee Sub-Class.

465.    Plaintiff and members of the Tennessee Sub-Class are "consumers" as defined by the Tenn. Code Ann. § 47-18-103(2).

466.    Plaintiff, members of the Tennessee Sub-Class, and Ford are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(9).

467.    The Class Vehicles are "goods" within the meaning Tenn. Code Ann. § 47-18-103(5).

468.    Ford was and is engaged in "trade," "commerce," and/or "consumer transaction[s]" within the meaning of Tenn. Code Ann. § 47-18-103(11).

469.    The Tennessee Consumer Protection Act ("Tennessee CPA") provides that, "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices," including but not limited to, "(2)

causing likelihood of confusion or misunderstanding as to the certification of goods . . . ;" "(5) representing that goods . . . have . . . characteristics . . . uses, benefits . . . that they do not have;" "(7) representing that goods . . . are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;" "(9) advertising goods or services with intent not to sell them as advertised;" "(22) using any advertisement containing an offer to sell goods . . . when the offer is not a bona fide effort to sell the advertised goods . . . ;" and "(27) engaging in any other act or practice which is deceptive to the consumer or any other person…" Tenn. Code Ann. § 47-18-104(a), (b). Ford engaged in unlawful trade practices and unfair or deceptive acts or practices that violated the Tennessee CPA.

470.   Ford participated in unfair or deceptive trade practices that violated the Tennessee CPA. As described below and alleged throughout the Complaint, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and that stood behind its vehicles after they were sold. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Mounting Bolt Defect in the course of its business.

471.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

472.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

473.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

474.   Ford knew or should have known that its conduct violated the Tennessee CPA.

475.   Ford was under a duty to Plaintiff and the Tennessee Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.   Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.   Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.   Ford actively concealed the defective nature of the Class Vehicles

from Plaintiff and the Tennessee Sub-Class Members at the time of sale and thereafter.

476.   By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

477.   The facts concealed or not disclosed by Ford to Plaintiff and the Tennessee Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Ford's Class Vehicles, or to pay less for them. Whether a vehicle's rear subframe is defective, which can cause the rear differential and rear axles to detach from the driveshaft, and rollaway when parked, is a material safety concern. Had Plaintiff and the Tennessee Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

478.   Plaintiff and the Tennessee Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

479.   As a result of Ford's misconduct, Plaintiff and the Tennessee Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

480.   As a direct and proximate result of Ford's unfair or deceptive acts or

practices, Plaintiff and the Tennessee Sub-Class Members have suffered and will continue to suffer actual damages.

481.   Ford's violations present a continuing risk to Plaintiff and the Tennessee Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

482.   Ford is liable to Plaintiff and the Tennessee Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Tenn. Code Ann. § 47-18-109. Because Ford's actions were willful and knowing, Plaintiff's and the Tennessee Sub-Class's damages should be trebled.

**COUNT XVIII**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT –**
**CONSUMER PROTECTION ACT**
**(Texas Bus. & Com. Code § 17.41, *et seq*.)**
**(On behalf of the Texas Sub-Class)**

483.   Plaintiffs Shawn and Julie Thibodeaux ("Plaintiffs" for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

484.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Texas Sub-Class.

485.   Ford is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

486.   Plaintiffs and the members of the Texas Sub-Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41 and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

487.   Ford is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

488.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

489.   Ford participated in unfair or deceptive trade practices that violated the Texas DTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its

vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Mounting Bolt Defect in the course of its business.

490.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

491.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

492.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

493.   Ford knew or should have known that its conduct violated the Texas DTPA.

494.   Ford was under a duty to Plaintiffs and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.   Ford was in a superior position to know the true state of facts about

the safety defect in the Class Vehicles;

b.  Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.  Ford actively concealed the defective nature of the Class Vehicles from Plaintiffs and the Texas Sub-Class Members at the time of sale and thereafter.

495.   By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

496.   The facts concealed or not disclosed by Ford to Plaintiffs and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Ford's Class Vehicles, or to pay less for them. Whether a vehicle's rear subframe is defective, which can cause the rear differential and rear axles to detach from the driveshaft, and rollaway when parked, is a material safety concern. Had Plaintiffs and the Texas Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

497.   Plaintiffs and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

498.   As a result of Ford's misconduct, Plaintiffs and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

499.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiffs and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

500.   Plaintiffs provided notice of their claims by letter dated April 20, 2023.

501.   Ford's violations present a continuing risk to Plaintiffs and the Texas Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

502.   Ford is liable to Plaintiffs and the Texas Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Tex. Bus. & Com. Code § 17.50. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

**COUNT XIX**
**BREACH OF EXPRESS WARRANTY**
**(Texas Bus. & Com. Code §§ 2.313 and 2A.210)**
**(On behalf of the Texas Sub-Class)**

503.   Plaintiffs Shawn and Julie Thibodeaux ("Plaintiffs" for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

504. Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Texas Sub-Class.

505. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20) and a "seller" of motor vehicles under § 2.103(a)(4).

506. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

507. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

508. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

509. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

510. In a section entitled "New Vehicle Limited Warranty," Ford's express warranty provides, in relevant part, that Ford will provide warranty services when the vehicle is brought to an authorized Ford dealer. The authorized Ford dealer will without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts.

511. Ford designed, manufactured and/or installed the Rear Subframe Assemblies and the Rear Subframe Assemblies' component parts in the Class

Vehicles, and the Rear Subframe Assemblies and their component parts are covered by the express warranties.

512.  The Mounting Bolt Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Texas Plaintiffs and the Texas Sub-Class Members.

513.  Texas Plaintiffs and the Texas Sub-Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

514.  Under the express warranties, Ford was obligated to correct the Mounting Bolt Defect in the vehicles owned or leased by Texas Plaintiffs and the Texas Sub-Class Members.

515.  Although Ford was obligated to correct the Mounting Bolt Defect, none of the attempted fixes to the Mounting Bolt Defect are adequate under the terms of the warranties, as they did not cure the defect.

516.  Ford breached the express warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranties, Ford falsely informed Texas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, and/or replaced defective components with equally defective components, without actually repairing the Class Vehicles.

517.  Ford has failed and refused to conform the Class Vehicles to the express

warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on their part to disclaim liability for their actions.

518.   Moreover, Ford's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

519.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Texas Plaintiffs and the Texas Sub-Class Members. Among other things, Texas Plaintiffs and the Texas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class Members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

520.   Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

521.   Texas Plaintiffs and the Texas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure their breach of written warranty would have been futile. Ford were also on notice of the Mounting Bolt Defect from the complaints and service requests they received

from Plaintiffs and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal and external sources.

522.   Nonetheless, Texas Plaintiffs provided notice to Ford of the breach of express warranties when he repeatedly took his vehicle to authorized GM dealerships and requested warranty repairs. Texas Plaintiffs further provided notice to Ford of their claims via letter dated April 20, 2023.

523.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Mounting Bolt Defect if Ford determines the repairs are appropriately covered under the warranties, Ford cannot now deny that the warranties cover the Mounting Bolt Defect.

524.   Because Ford has not been able to remedy the Mounting Bolt Defect, any limitation on remedies included in the warranties causes the warranties to fail their essential purposes, rendering them null and void.

525.   As a direct and proximate cause of Ford's breach, Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

526.  As a direct and proximate result of Ford's breach of express warranties, Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT XX
### BREACH OF IMPLIED WARRANTY
**(Texas Bus. & Com. Code §§ 2.314 and 2A.212)**
**(On behalf of the Texas Sub-Class)**

527.  Plaintiffs Shawn and Julie Thibodeaux ("Plaintiffs" for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

528.  Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Texas Sub-Class.

529.  Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

530.  With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

531.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

532.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

533.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the Mounting Bolt Defect to customers through authorized dealers, like those from whom Plaintiffs and the Texas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiffs and the Texas Sub-Class Members, with no modification to the defective Rear Subframe Assembly.

534.    Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

535.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Rear Subframe Assemblies that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their Rear Subframe Assemblies would be fit for their intended use while the Class Vehicles were being operated.

536.    Contrary to the applicable implied warranties, the Class Vehicles and their Rear Subframe Assemblies, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with

reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design, installation, and manufacture of their Rear Subframe Assemblies and the existence of the Mounting Bolt Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

537.   As a result of Ford's breach of the applicable implied warranties, Plaintiffs and the Texas Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Mounting Bolt Defect, Plaintiffs and the Texas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' Rear Subframe Assemblies are substantially certain to fail before their expected useful life has run.

538.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Texas Bus. & Com. Code §§ 2.314 and 2A.212.

539.   Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

540.   Plaintiffs and the Texas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure their breach of implied warranty would have been futile. Ford were also on notice of the

Mounting Bolt Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the Rear Subframe Assemblies or components thereof, and through other internal sources.

541.   In addition, on or about April 23, 2023, Plaintiffs gave notice to Ford that they intended to pursue warranty claims on behalf of a class of similarly situated consumers.

542.   Because Plaintiffs purchased their vehicle from an authorized Ford dealer, they are in privity with Ford since, (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims, and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and the contracts between Ford and their authorized dealers.

543.   As a direct and proximate cause of Ford's breach, Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

544.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

545.   **WHEREFORE**, Plaintiffs, on behalf of themselves and members of the respective classes, as appropriate, respectfully requests that this Court:

(a)   determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

(b)   appoint Plaintiffs as representatives of the Nationwide Class as well as all Subclasses, as appropriate, and their counsel as Class counsel;

(c)   award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and members of the Class are entitled under the claims and causes of action as alleged above, at this time;

(d)   award pre-judgment and post-judgment interest on any monetary relief;

(e)   award reasonable attorneys' fees and costs; and

(f)   grant such further relief that this Court deems appropriate.

## TRIAL BY JURY DEMANDED ON ALL COUNTS

Date: December 13, 2024

By: *E. Powell Miller*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
Mitchell J. Kendrick (P83705)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200

Facsimile: (248) 652-2852
epm@millerlawpc.com
dal@millerlawpc.com
mjk@millerlawpc.com

**CAPSTONE LAW APC**
Cody R. Padgett
Laura E. Goolsby
Nathan N. Kiyam
1875 Century Park East
Suite 1000
Los Angeles, CA 90067
Telephone: (310) 556-4811
Cody.Padgett@Capstonelawyers.com
Laura.Goolsby@Capstonelawyers.com
Nate.Kiyam@Capstonelawyers.com

**BERGER MONTAGUE PC**
Russell D. Paul
Abigail J. Gertner
Amey J. Park
Natalie Lesser
1818 Market Street, Suite 3600
Philadelphia, PA 19103
215.875.3000
rpaul@bm.net
agertner@bm.net
apark@bm.net
nlesser@bm.net

**BARRACK, RODOS, & BACINE**
Stephen R. Basser
Samuel M. Ward
600 W Broadway, Suite 900
San Diego, CA 92101
Telephone: (619)230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

**EMERSON FIRM, PLLC**
John G. Emerson
2500 Wilcrest, Suite 300
Houston, TX 77042
jemerson@emersonfirm.com
Telephone: (800) 551-8649
Facsimile: (501) 286-4659

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Jonathan D. Selbin
Jason L. Lichtman
Muriel Kenfield-Kelleher
250 Hudson Street, 8th Floor
New York, NY 10013-1413
212.355.9500
jselbin@lchb.com
jlichtman@lchb.com
mkenfieldkelleher@lchb.com

Andrew R. Kaufman
222 2nd Avenue South, #1640
Nashville, TN 37201
615.313.9000
akaufman@lchb.com

**CORPUS LAW PATEL, LLC**
Ketan A. Patel *
P.O. Box 724713
Atlanta, Georgia 31139
678.597.8020
kp@corpus-law.com

*Attorneys for Plaintiffs and the Proposed Class*